● Exhibit "A" ●

# ADJUSTABLE RATE NOTE
### (6-Month LIBOR Index - Rate Caps)
### (First Business Day of Preceding Month Lookback)

Serv #: ▓▓▓▓▓▓▓

TRIANA
Loan #: ▓▓▓▓▓▓▓▓▓▓
MIN:

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

February 9, 2006          MIAMI                              Florida
[Date]                    [City]                            [State]
19771 SOUTHWEST 84 AVENUE MIAMI, FL 33189

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 360,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is WMC MORTGAGE CORP.
                                                                          . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.720     %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st  day of each month beginning on  April 1, 2006  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  March 1, 2036  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  4828 Loop Central Drive, Houston, TX 77081-2226                                                              or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 2,164.32          . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of  March, 2008       , and may change on that day every  6th    month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent

FLORIDA ADJUSTABLE RATE NOTE – 6-month LIBOR Index (First Business Day Lookback) – Single Family –
DOCUJ1111
DOCUJ1B1.VTX 01/27/2006                           Page 1 of 4

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

x (signature)



index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and One-Fourth** percentage point(s) ( **6.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on a date that is 10 years after the Maturity Date (such date being referred to herein as the "Amortization Date") at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I understand that as a result of the Amortization Date being after the Maturity Date, I will have a balloon payment on the Maturity Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.720** % or less than **6.720** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **13.220** %, or less than **6.720** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

FLORIDA ADJUSTABLE RATE NOTE – 6-month LIBOR Index (First Business Day Lookback) – Single Family –
DOCUI1H2
DOCUJ1H2.VFX 02/08/2006

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security



Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

2/9/06.

- Borrower - ANDRES E TRIANA - Date -

Pay to the order of

without _____

Monica _____

WMC Mortgage Corp.

*[Sign Original Only]*

FLORIDA ADJUSTABLE RATE NOTE – 6-month LIBOR Index (First Business Day Lookback) – Single Family –
DOCUJIII4
DOCUJ1E4.VTX  01/27/2006

Page 4 of 4



CFN 2006R0169211
OR Bk 24242 Pgs 2232 - 2254; (23pgs)
RECORDED 02/15/2006 15:58:06
MTG DOC TAX 1,260.00
INTANG TAX 720.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

After Recording Return To:
**WMC MORTGAGE CORP. - POST CLOSING**

1 RAMLAND RD

ORANGEBURG, NY 10962

Attn:     (Equity Services)

**This Document Prepared By:**
CARSTENE MOSCARELLI

WMC MORTGAGE CORP.

6320 CANOGA AVENUE 10TH FL (MAILROOM)

WOODLAND HILLS, CA 91367

---

[Space Above This Line For Recording Data]

## MORTGAGE

Serv #: ███████

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **February 9, 2006**        , together with all Riders to this document.

(B) **"Borrower"** is ANDRES E TRIANA AND ~~ALEXIS SABALA~~ both single persons
ISRAEL ALEXIS ZABALLA,

Borrower is the mortgagor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) **"Lender"** is WMC MORTGAGE CORP.

Lender is a **Corporation**                                    organized and existing under the laws of **CALIFORNIA**                      . Lender's address is   **P.O. BOX 54089, LOS ANGELES, CA 90054-0089**

(E) **"Note"** means the promissory note signed by Borrower and dated   **February 9, 2006**        . The Note states that Borrower owes Lender

**Three Hundred Sixty Thousand And 00/100**
Dollars (U.S. $ **360,000.00**     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 1, 2036**          .

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3010 1/01        (page 1 of 14 pages)
DOCUKFL1
DOCUKFL1.VTX   08/25/2005





**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☒ Other(s) [specify] **Balloon Rider** | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                             of    **MIAMI-DADE**                                             :
[Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]
**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AND KNOWN AS EXHIBIT 'A'.**




which currently has the address of  **19771 SOUTHWEST 84 AVENUE**
                                               [Street]
**MIAMI**                                    , Florida      **33189**            ("Property Address"):
[City]                                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
    **2.   Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.




If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by




RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,




any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security




Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          *(page 8 of 14 pages)*
DOCUKFL8
DOCUKFL8.VTX  08/25/2005



Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 1/01        *(page 9 of 14 pages)*
DOCUKFL9
DOCUKFL9.VTX   08/25/2005




by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall co ntinue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or




(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____     2/9/06
- Borrower - ANDRES E TRIANA - Date -

_____     2/9/06
ALEXIS ZABALLA - Date -
ISRAEL ALEXIS ZABALLA

INITIAL
I Z
HERE

Signed, sealed and delivered in the presence of:

_____          _____
Witness    Mayra Albelo                            Witness    SHIRLEY OLIVERA

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 13 of 14 pages)
DOCUKFL13
DOCUKFLD.VMX   08/25/2005

[Space Below This Line For Acknowledgment]

STATE OF *Florida*
COUNTY OF *Miami-Dade*

The foregoing instrument was acknowledged before me this *9th day of Feb. 2006* by

*Andres E. Triana and Israel Alexis Zaballa*

who is personally known to me or who has produced *Valid D/L* as identification.

_____
Notary Public

My Commission Expires:



MAYRA ALBELO
MY COMMISSION # DD 478431
EXPIRES: October 20, 2009
Bonded Thru Notary Public Underwriters

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        *(page 14 of 14 pages)*
DOCUKFL14
DOCUKFLE.VTX   08/25/2005

[Space Above This Line For Recording Data]

# BALLOON RIDER

TRIANA
Loan #:
MIN:

Serv #:

THIS BALLOON RIDER is made this **9th**   day of **February, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note (the "Note") to **WMC MORTGAGE CORP.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
**19771 SOUTHWEST 84 AVENUE MIAMI, FL 33189**

[Property Address]

The interest rate stated on the Note is called the "Note Rate". The date of the Note is called the "Note Date". I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder".

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or the Note):

**NOTWITHSTANDING THE 40-YEAR TERM AND THE 40-YEAR AMORTIZATION PERIOD, THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE**

**BALLOON RIDER-MULTISTATE (01/97)**
DOCU4A1
DOCU4A1.VTX  02/08/2006                                   Page 1 of 2



THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT
MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY
ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME
LENDER.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider.

- Borrower - ANDRES E TRIANA - Date -    2/7/06

- ALEXIS ZABALA - Date -    2/9/06

**BALLOON RIDER-MULTISTATE  (01/97)**
DOCU4A2
DOCU4A2.VTX  02/08/200                                      Page 2 of 2

## ADJUSTABLE RATE RIDER
### (6-Month LIBOR Index - Rate Caps)
### (First Business Day of Preceding Month Lookback)

Serv #: ███████

TRIANA
Loan #: ████████
MIN:

THIS ADJUSTABLE RATE RIDER is made this 9th      day of **February, 2006**          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the
Borrower's Adjustable Rate Note (the "Note") to **WMC MORTGAGE CORP.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
**19771 SOUTHWEST 84 AVENUE, MIAMI, FL 33189**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
A.      **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of     6.720        %. The Note provides for
changes in the interest rate and the monthly payments, as follows:
4.      **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A)     **Change Dates**
The interest rate I will pay may change on the first day of **March, 2008**                  ,
and may change on that day every    6th      month thereafter. Each date on which my interest rate
could change is called a "Change Date."

MULTISTATE ADJUSTABLE RATE RIDER 6-Month LIBOR Index (First Business Day Lookback)--Single Family--
DOCUJ1N1                                              Page 1 of 3
DOCUJ1N1.VTX  01/27/2006

**(B)    The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and One-Fourth** percentage point(s) ( **6.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on a date that is 10 years after the Maturity Date (such date being referred to herein as the "Amortization Date") at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I understand that as a result of the Amortization Date being after the Maturity Date, I will have a balloon payment on the Maturity Date.

**(D)    Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.720** % or less than **6.720** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **13.220** %, or less than **6.720** %.

**(E)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)    Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**MULTISTATE ADJUSTABLE RATE RIDER 6-Month LIBOR Index (First Business Day Lookback)--Single Family--**
DOCU1N2
DOCU1N2.VTX   02/08/2006

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

2/9/06

– Borrower – ANDRES E TRIANA – Date –

2/9/06

Israel

ALEXIS ZABALLA – Date –

Zaballa

INITIAL HERE

# PLANNED UNIT DEVELOPMENT RIDER

Servicing #: ▮▮▮▮▮▮

TRIANA
Loan #: ▮▮▮▮▮▮
MIN: ▮▮▮▮▮▮

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **9th** day of **February 2006**,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security
Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure
Borrower's Note to **WMC MORTGAGE CORP.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**19771 SOUTHWEST 84 AVENUE, MIAMI, FL 33189**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such
parcels and certain common areas and facilities, as described in
**THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE
PROPERTY.**

(the "Declaration"). The Property is a part of a planned unit development known as
**SAGA BAY**

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity
owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses,
benefits and proceeds of Borrower's interest.

    **PUD COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

    **A.   PUD Obligations.** Borrower shall perform all of Borrower's obligations under the
PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii)
articles of incorporation, trust instrument or any equivalent document which creates the Owners

**MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3150 1/01**
DOCURPA1
DOCURPA1.VTX  08/25/2005
*(page 1 of 3 pages)*

Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

    **B.**   **Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

    What Lender requires as a condition of this waiver can change during the term of the loan.

    Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

    In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

    **C.**   **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

    **D.**   **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

    **E.**   **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

    **F.**   **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

- Borrower - ANDRES E TRIANA - Date -    2/9/06

Israel    ALEXIS SHALAM - Date -    2/9/06
Zabulla

**EXHIBIT "A"**

LOT 8, BLOCK 7, OF SAGA BAY, SECTION 1, PART 2, ACCORDING TO THE PLAT
THEREOF, AS RECORDED IN PLAT BOOK 95, PAGE 61, OF THE PUBLIC RECORDS OF
MIAMI-DADE COUNTY, FLORIDA.

CFN: 20150331716 BOOK 29628 PAGE 2403
DATE:05/20/2015 10:17:59 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

ASSIGNMENT TEAM
WELLS FARGO BANK, N.A.
MAC: N9289-016
PO BOX 1629
EAGAN, MN  55121-4400

## CORRECTIVE ASSIGNMENT OF MORTGAGE

Miami-Dade, Florida
"TRIANA"

MIN # █████████   SIS #: 1-888-679-6377

Date of Assignment: May 15th, 2015
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WMC MORTGAGE
CORPORATION, ITS SUCCESSORS AND ASSIGNS at P.O. BOX 2026, FLINT, MI 48501, 1901 E VOORHEES ST
STE C, DANVILLE, IL  61834
Assignee: DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN STANLEY ABS
CAPITAL I INC. TRUST 2006-HE4, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HE4 at 1761
EAST SAINT ANDREW PLACE, SANTA ANA, CA  92705
Executed By: ANDRES E TRIANA AND ISRAEL ALEXIS ZABALLA, BOTH SINGLE PERSONS  To: MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WMC MORTGAGE CORPORATION, ITS
SUCCESSORS AND ASSIGNS
Date of Mortgage: 02/09/2006 Recorded:  02/15/2006  in Book/Reel/Liber: 24242 Page/Folio: 2232 as Instrument
No.: 2006R0169211  In the County of Miami-Dade, State of Florida.

Property Address: 19771 SOUTHWEST 84 AVENUE, MIAMI, FL  33189

"THAT THIS CORRECTIVE ASSIGNMENT OF MORTGAGE IS TO INCLUDE FULL MERS ASSIGNOR  VERBIAGE
AND CORRECT THE ASSIGNEE ON THAT CERTAIN ASSIGNMENT OF MORTGAGE RECORDED 03/02/2009 AS
INSTRUMENT 2009R0150754 IN O.R. BOOK 26770, PAGE 3912 IN THE PUBLIC RECORDS OF MIAMI-DADE
COUNTY, FLORIDA."

   KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $360,000.00 with interest, secured thereby, and the full benefit of all the
powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys
unto the said Assignee, the Assignor's interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WMC MORTGAGE
CORPORATION, ITS SUCCESSORS AND ASSIGNS
On _____5/18/15_____

By: _____
    Kelley Christine Butikofer
Assistant Secretary

CORRECTIVE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF Minnesota
COUNTY OF Dakota

On ___5-18-15___, before me, **Bhavdip Chhotalal Chauhan**, a Notary Public in the State of Minnesota, personally appeared __Kelley Christine Butikofer__, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

~~Bhavdip Chhotalal Chauhan~~

Notary Expires: _1/31/16_

BHAVDIP CHHOTALAL CHAUHAN
NOTARY PUBLIC-MINNESOTA
My Commission Expires
January 31, 2016

(This area for notarial seal)

**Prepared By: LESLIE ANN KNUTSON, WELLS FARGO BANK, N.A. 1000 BLUE GENTIAN RD, SUITE 200, EAGAN, MN 55121**
1-866-234-8271

*LAK*LAKWFEM*05/15/2015 10:40:20 AM* WFEM01WFEMA0000000000000001330416* FLDADE* FLSTATE_MORT_ASSIGN_ASSN **LAKWFEM*

CFN 2009R0150754
OR Bk 26770 Pg 3912; (1pg)
RECORDED 03/02/2009 13:31:32
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

Prepared by:           DAVID J. STERN, ESQ
Record &Return to:     900 South Pine Island Road Suite 400
                       Plantation, FL 33324-3920
                       08-46143 (ASCF)

This space is for recording purposes only

## ASSIGNMENT OF MORTGAGE

### KNOW ALL MEN BY THESE PRESENTS:

**THAT** MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Residing or located at c/o WELLS FARGO BANK, N.A., 3476 STATEVIEW BLVD., FT. MILL, SC 29715 herein designated as the assignor, for and in consideration of the sum of $1.00 Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC TRUST 2006-HE4 residing or located at: C/O 3476 STATEVIEW BLVD, FT. MILL, SC 29715 herein designated as the assignee, the mortgage executed by ANDRES E. TRIANA AND ISRAEL ALEXIS ZABALLA, BOTH SINGLE PERSONS recorded in MIAMI-DADE County, Florida at book 24242 and page 2232 encumbering the property more particularly described as follows:

LOT 8, BLOCK 7, OF SAGA BAY, SECTION 1, PART 2, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 95, PAGE 61, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

together with the note and each and every other obligation described in said mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee, its successors and assigns forever, but without recourse on the undersigned.

Pursuant to the provisions of Sec. 689.071, Florida Statutes, the within named Trustee has the power and authority to protect, conserve and to sell, or to lease, or to encumber, or otherwise to manage and dispose of the above-described mortgage and the real property encumbered thereby.

**In Witness Whereof,** the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed , this **20** day of **Feb.** , **20 09** but effective as of the 26TH day of March, 2008.

Signed in the presence of:                    MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

ATTEST:                                        BY:
WITNESS:                                       PRINT NAME: CHERYL SAMONS
                                               TITLE: ASSISTANT SECRETARY
Print Name: Amanda A. Mitchell

WITNESS:

Print Name: Shannon Smith

STATE OF    Florida
COUNTY OF   Broward

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid county and state, on this the **20** day of **Feb.** , **2009**, within my jurisdiction, the within named **CHERYL SAMONS** who is personally known to me and who acknowledged to me that (s)he is ASSISTANT SECRETARY and that for and on behalf of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and as its act and deed (s)he executed the above and foregoing instrument, after first having been duly authorized by MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. to do so.

WITNESS my hand and official seal in the County and State last aforesaid this **20** day of **Feb.** , **20 09**

NOTARY PUBLIC



After recording please return to:
**SPECIALIZED LOAN SERVICING LLC**

**8742 LUCENT BLVD, SUITE 300
HIGHLANDS RANCH, CO  80129**

This document prepared by:
**SPECIALIZED LOAN SERVICING LLC**

**8742 LUCENT BLVD, SUITE 300
HIGHLANDS RANCH, CO  80129**

Tax Parcel ID No. ▉▉▉▉▉▉▉

LN # ▉▉▉▉▉▉▉▉▉▉▉▉



————————————[Space Above This Line For Recording Data]————————————
**Original Principal Amount $360,000.00**
**Unpaid Principal Amount $353,260.00**                     Loan No: ▉▉▉▉▉▉
**New Principal Amount $688,947.33**
**Total Cap Amount $332,352.33**

# MODIFICATION AGREEMENT

Executed on this day: **October 24, 2017**
Borrower ("I"): **ANDRES E TRIANA** whose address is **19771 SW 84 AVE, MIAMI, FL  33189**
("Borrower").
If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For
purposes of this document words signifying the singular (such as "I") shall include the plural (such as
"we") and vice versa where appropriate.
Lender or Servicer ("Lender"): **SPECIALIZED LOAN SERVICING LLC** whose principal place of business
and mailing address is **8742 LUCENT BLVD, SUITE 300, HIGHLANDS RANCH, CO  80129** ("Lender").
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **February 9,
2006**

Original security instrument in the amount of **$360,000.00** and recorded on **February 15, 2006** in Book,
Volume, or Liber No. **24242**, at Page **2232** (or as Instrument No. **2006R0169211**) , in the Office of the
County Clerk or Register of **MIAMI-DADE** County, State of **FLORIDA**.

Loan Number: ▉▉▉▉▉▉▉▉▉

Property Address ("Property"): **19771 SW 84 AVE, MIAMI, FL 33189**

Legal Description: **SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:**

Modification Agreement
Proprietary W3078H                         Page 1 of 9                         90386FL 07/17

*11/27/17*

If my representations in Section 1 continue to be true in all material respects, then this Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations.** I certify, represent to Lender, covenant and agree:

    A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;
    B. Property Type: Single Family
    C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;
    D. I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Modification Program ("Program"));
    E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;
    F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and
    G. I have made or will make all payments required under a trial period plan.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

    A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and
    B. I understand that the Loan Documents will not be modified unless and until the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **October 1, 2017** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect. The first modified payment will be due on **November 1, 2017**.

    A. The new Maturity Date will be: **April 25, 2036**.
    B. The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges) and deferred principal

---

and other deferred amounts from a prior modification, collectively, "Unpaid Amounts") less any amounts paid to Lender but not previously credited to my Loan. The new Principal balance of my Note will be **$688,947.33** (the 'New Principal Balance'). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C. **$206,684.20** of the New Principal Balance shall be deferred (the 'Deferred Principal Balance') and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the 'Interest Bearing Principal Balance' and this amount is **$482,263.13**. Interest at the rate of **3.875%** will begin to accrue on the Interest Bearing Principal Balance as of **October 1, 2017** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **November 1, 2017**. My payment schedule for the modified Loan is as follows

Borrower promises to make monthly payments of principal and interest of U.S. **$1,978.17** beginning on **November 1, 2017**, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. I will make these payments every month, in addition to 1 final balloon payment, consisting of deferred principle in the amount of **$206,684.20** and additional unpaid principal amount of **$346,814.47**. The Balloon payment amounts stated are if all monthly payments have been made as scheduled. At the end of the term, any balance remaining will have to be paid.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly. Your initial monthly escrow payment will be **$1,406.99**. Your initial total monthly payment will be **$3,385.16**.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest- only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the  Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F. If on the, ('Maturity' or 'Modified Maturity Date'), Borrower still owes amounts under the Note and the  Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Modified Maturity Date.

4.  **Additional Agreements.** I agree to the following:

---

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co- borrower is deceased; (ii) the borrower and co- borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items.  Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires

interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E.   That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in

accordance with their terms and are hereby reaffirmed.

F.   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.   That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.   That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.    That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.    That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product (s), and/ or subordination agreement (s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/ or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement (s), title insurance product (s) and/ or subordination agreement(s),

then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Modification program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, for mailing address, where applicable, 1901 E. Voorhees Street, Suite C, Danville, IL 61834, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury; (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan (s); (iv) companies that perform support services for the Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/ or this Agreement is lost, misplaced, misstated,inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

**THIS COMMUNICATION IS FROM A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

In Witness Whereof, the Lender and I have executed this Agreement.

**Specialized Loan Servicing LLC**
**As Servicer**
Dane Wallace
Second Assistant Vice President
Default Administration

By: _____ (Seal)
Name: _____
Its: _____
Date: _____

_____ (Seal)   Date: _11/06/2017_
**ANDRES E. TRIANA**
Post-Office Address: **19771 SW 84 AVE, MIAMI,**
**FL 33189**

If the borrower is an inter vivos revocable trust, we require each of the trustees to sign this document in the signature blocks below.

_____ Trustee of the    _____ Trust instrument dated

_____ For the benefit of    _____ (Borrower)

### ACKNOWLEDGMENT

State of _FLORIDA_    §
                      §
County of _DADE_      §

The foregoing instrument was acknowledged before me on _____ by **ANDRES E. TRIANA** who is personally known to me or who has produced _FDL_ , as identification.

_____
Signature of Person Taking Acknowledgment

_ZADIS Frometa_
Name Type, Printed or Stamped

_Notary_
Title or Rank

Serial Number, if any: _FF 182203_

My Commission Expires: _12/05/2018_

ZADIS FROMETA
Notary Public - State of Florida
Commission # FF 182203
My Comm. Expires Dec 9, 2018
Bonded through National Notary Assn.

(Seal)

**Modification Agreement**
**Proprietary W3078H**          Page 7 of 9          90386FL 07/17

## ACKNOWLEDGMENT

State of Colorado §
§
County of Douglas §

The foregoing instrument was acknowledged before me this _____11/21/2017_____ by
Dave Wallace , SAVP _____ of **SPECIALIZED LOAN**
**SERVICING LLC a DELAWARE** corporation, on behalf of the corporation.

_____
Signature of Person Taking Acknowledgment

Mandy Nguyen
Printed Name

CR Coordinator / SLS
Title or Rank

```
MANDY NGUYEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20174002625
MY COMMISSION EXPIRES 01/17/2021
```

(Seal)                                         Serial Number, if any:  _____

EXHIBIT A

BORROWER(S): ANDRES E TRIANA

LOAN NUMBER ████████████

LEGAL DESCRIPTION:

STATE OF FL, COUNTY OF MIAMI-DADE, AND DESCRIBED AS FOLLOWS:

LOT 8, BLOCK 7, OF SAGA BAY, SECTION 1, PART 2, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 95, PAGE 61, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

Tax Parcel ID No ████████████

ALSO KNOWN AS: 19771 SW 84 AVE, MIAMI, FL 33189

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CASE NO. 18-22369-LMI** |
| | § | |
| **ANDRES E TRIANA** | § | |
| **AKA ANDRES ERNESTO TRIANA** | § | **CHAPTER 7** |
| **AKA ANDRES TRIANA** | § | |
| **DEBTOR(S)** | § | |
| | § | |
| **SPECIALIZED LOAN SERVICING, LLC, AS** | § | |
| **SERVICING AGENT FOR DEUTSCHE BANK** | § | |
| **NATIONAL TRUST COMPANY, AS TRUSTEE** | § | |
| **FOR MORGAN STANLEY ABS CAPITAL I** | § | |
| **INC. TRUST 2006-HE4, MORTGAGE PASS-** | § | |
| **THROUGH CERTIFICATES, SERIES 2006-HE4** | § | |
| **MOVANT** | § | |
| **VS** | § | |
| **ANDRES E TRIANA** | § | |
| **AND DREW M DILLWORTH, TRUSTEE** | § | |
| **RESPONDENTS** | § | |
| | § | |

**AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM STAY**

"I, _____Ami McKernan_____ hereby state the following:

1.  Specialized Loan Servicing, LLC, as servicing agent for Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital l Inc. Trust 2006-HE4, Mortgage Pass-Through Certificates, Series 2006-HE4 ("Movant") and its successors and/or assigns, is authorized to sue on its own behalf.

2.  I am an employee of Specialized Loan Servicing, LLC and duly authorized representative of Movant and hereby make this affidavit in such capacity. All facts recited herein are within my personal knowledge of all records concerning the account with Debtor(s) and are true and correct.

3.  In the course of my employment, I have become familiar with the manner and method in which Specialized Loan Servicing, LLC maintains its books and records in its regular course of business. Those books and records are managed by employees and agents whose duty it is to keep the books and records accurately and completely and to record each event or item at or near the time of the event or item so noted.

4.  I am familiar with the books and records related to the Note secured by Mortgage/Deed of Trust of even date therewith covering certain real property located at 19771 Southwest 84 Avenue, Miami, FL 33189, and more particularly described in the Mortgage/Deed of Trust.

5.  Note and/or Mortgage/Deed of Trust, Loan Number xxxxxx5198, in the original principal amount of $360,000.00, dated February 9, 2006 was executed by the Original Mortgagor(s): Andres E Triana and Israel Alexis Zaballa to WMC Mortgage Corp. I hereby certify that true and correct copies of the original promissory note and original mortgage are attached to the corresponding Motion as Composite Exhibit "A."

6.  Debtor(s) are in default on their obligations to Movant in that Debtor(s) have failed to make their installment payments when due and owing pursuant to the terms of the above-described Note and/or Mortgage/Deed of Trust.

7.  As of October 17, 2018, the unpaid principal balance was $479,844.33, the deferred principal balance was $206,684.20, which is a combined principal balance of $686,528.53. Debtor(s) are due 10 contractual payments, totaling: $30,781.19.

| Number of Missed Payments | From | To | Missed Principal & Interest | Missed Escrow (If Applicable) | Monthly Payment Amount | Total Amounts Missed |
|---|---|---|---|---|---|---|
| 3 | 01/01/2018 | 03/01/2018 | $1,978.17 | $1,406.99 | $3,385.16 | $10,155.48 |
| 7 | 04/01/2018 | 10/01/2018 | $1,978.17 | $968.36 | $2,946.53 | $20,625.71 |

8.  By failing to make the regular monthly installment payments due pursuant to the Note and/or Mortgage/Deed of Trust, Debtor(s) have not provided adequate protection to Movant.

9.  Movant has had to retain counsel to represent it before this Court and is incurring legal expenses and attorneys' fees for which it is entitled to reimbursement under the terms of the Note.

{THIS SPACE INTENTIONALLY LEFT BLANK}

10. Further, according to the Brokers's Price Opinion, the estimated value of the subject property is $358,000.00.

Thus, after full satisfaction of the indebtedness due to Movant under the terms of the Note there is no equity

in the property.

I declare that the foregoing facts are true and correct to the best of my knowledge.

FURTHER AFFIANT SAYETH NOT."

<div style="margin-left:40%;">

**Specialized Loan Servicing, LLC, as servicing agent for Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2006-HE4, Mortgage Pass-Through Certificates, Series 2006-HE4**

</div>

18-22369-LMI                    By:    _____    OCT 2 5 2018

Ami McKernan    Second Assistant Vice President
A duly Authorized Representative

---

State of Colorado
County of Douglas

The foregoing instrument was acknowledged before me this _October 25, 2018_ by
                                                                          (Date)

___Ami McKernan___    ___Second Assistant Vice President___    of Specialized Loan Servicing LLC, a Delaware
                    (Name, Title)

Limited Liability Company, on behalf of the LLC.

_____
(Notary's official Signature)    Susan Lemerand

05-03-2021
(Commission Expiration)

> **SUSAN LEMERAND**
> **NOTARY PUBLIC**
> **STATE OF COLORADO**
> **NOTARY ID 20174018735**
> **MY COMMISSION EXPIRES 05/03/2021**

---

AFFIDAVIT IN SUPPORT OF
MOTION FOR RELIEF FROM STAY

4127-N-8957

# INDEBTEDNESS WORKSHEET

## DEBT AS OF REFERRAL DATE

**A.**   **Total pre-petition indebtedness of debtor(s) to movant (if movant is not the lender, this refers to the indebtedness owed to the lender) as of petition filing date: $710,437.23**

| | | |
|---|---|---|
| 1. | Amount of principal: | $479,844.33 |
| 2. | Amount of interest: | $15,636.86 |
| 3. | Amount of escrow (taxes and insurance): | $7,650.14 |
| 4. | Amount of forced placed insurance expended by Movant: | $0.00 |
| 5. | Amount of attorneys' fees billed to debtor(s) pre-petition: | $0.00 |
| 6. | Amount of pre-petition late fees, if any, billed to debtor(s): | $0.00 |

7.   Any additional pre-petition fees, charges or amounts charged to debtors account and not listed above:  (if additional space is needed, list the amounts on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here:_____.)

Property Inspections $135.00
Accrued Late Charges $296.70
BPO $115.00
Property Preservation $75.00

8.   Deferred Principal Principal $206,684.20

**B.**   **Contractual interest rate: 3.8750% (if interest rate is (or was) adjustable, list the rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; list the exhibit number here: _____.)**

4127-N-8957

## AMOUNT OF ALLEGED POST-PETITION DEFAULT
### (AS OF 10/17/2018)

C.  **Date last payment was received:** <u>12/07/2017</u>

D.  **Alleged total number of post-petition due:** <u>0</u>

E.  **All post-petition payments alleged to be in default:**

| Alleged Payment Due Date | Alleged Amount Due | Amount Received | Amount Applied To Principal | Amount Applied to Interest | Amount Applied to Escrow | Late Fee Charged (If Any) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

F.  **Amount of movant's attorneys fees billed to debtor for the preparation, filing and prosecution of this motion: $0.00**

G.  **Amount of movant's filing fee for this motion:  $0.00**

H.  **Other attorneys' fees billed to debtor post-petition:  $0.00**

I.  **Amount of movant's post-petition inspection fees:  $0.00**

J.  **Amount of movant's post-petition appraisal/broker's price opinion: $0.00**

K.  **Amount of forced placed insurance or insurance provided by the movant post-petition: $0.00_____**

L.  **Sum held in suspense by movant in connection with this contract, if applicable: $1,522.28**

M.  **Amount of other post-petition advances or charges for example taxes, insurance incurred by debtor etc (itemize each charge): $0.00**

4127-N-8957



# Broker Price Opinion

## 19771 SW 84th Ave, Cutler Bay, FL 33189

CERTAINTY   INGENUITY   ADVANTAGE

Computershare

**Computershare**

**BPO** BROKER PRICE OPINION

Inspection Date:08/20/2018    (Exterior Form)

## Order Details

| | | | |
|---|---|---|---|
| Client: | SLS | Mortgagors Name: | ANDRES E TRIANA |
| Client Loan Number: | | Order Number: | |
| Tracking #1: | | Property ID: | |
| Broker Name: | Sylvia Romagosa | License Number: | BK3151006 |
| Broker Phone: | (305) 219-2399 | eSignature*: | (*Signature on File) |
| Broker Company: | Capital Real Estate Brokers, Inc. | Date Signed: | 08/20/2018 |
| Company Address: | Street Address: 12910 SW 117 St  City, State Zip:  Miami, FL 33186 | Subject Address: | Street Address: 19771 SW 84th Ave  City, State Zip:  Cutler Bay        FL    33189 |

## Subject Front



8/20/2018 12:04 PM

## Neighborhood



## Price Estimate

| AS-IS (60-90 Days) | $358,000 | Repaired (60-90 Days) | $358,000 |
|---|---|---|---|
| AS-IS (Quick Sale) | $340,000 | Repaired (Quick Sale) | $340,000 |
| Estimated Land Value | $86,100.0 | Total Repair Costs | $0 |
| PSF As-Is (Price per Sq Ft) | $189.72 | PSF Repaired (Price per Sq Ft) | $189.72 |

## General Information

| | | | |
|---|---|---|---|
| County | Miami-Dade | Overall Condition | Average |
| Development or Neighborhood Name | Saga Bay Sec 01 Pt 02 | Curb Appeal | Average |
| Zoning | Residential | Landscaping Condition | Average |
| Legal Description | SAGA BAY SEC ONE PART TWOPB 95-61LOT 8 BLK 7LOT SIZE 85.000 X 105F/A/U 30-6003-012-0470COC 24242-2231 02 2006 1 | | |
| Homeowners Association | No | Secured | Yes |
| HOA Name | | Occupancy Status | Occupied |
| HOA Mgmt. Co, Name | | If "Occupied", by whom? | Owner |
| HOA Phone | | Subject conforms to neighborhood? | Yes |
| HOA Dues | | Are any Code Violations Posted? | No |
| HOA Dues Frequency | | Is the property subject to any rent controls? | No |
| HOA Dues Include | | Does the City or Municipality require Vacant Property Registration? | No |
| Environmental Hazards | None | Site Influences | None |

## Tax Data, Sales and Listing History

| | | | |
|---|---|---|---|
| Tax Assessed Value Date | 01/01/2017 | Last Known Sale Date | 02/15/2006 |
| Tax Assessed Value | 282,753 | Last Known Sale Price | 450,000 |
| Current Annual Real Estate Taxes | 5,546 | Taxes Delinquent? | No |
| Assessors Parcel Number (APN) | | Amount Delinquent | |
| Currently Listed for Sale (In MLS or FSBO) | No | | |
| Agent Name | | Original List Price | 459,000 |
| Agent Company | | Original List Date | 12/21/2005 |
| Agent Phone | | Current List Price | |
| DOM | | Current List Date | |
| Transaction Type | | Dwelling Access | |
| Listing Status | | MLS Number | |

BPO Ext (2018)

Subject Property
12-1 SW 84th Ave
Cutler Bay, FL 33189

Inspection Date: 08/20/2018    (Interior Form)

## Neighborhood & Market Information

| | | | |
|---|---|---|---|
| Density | Suburban | Prior 12 Month Home Values Have | Stable |
| Predominant Occupancy | Owner | At a Rate of | 7 |
| Neighborhood Values Low | 350,000 | Housing Supply of Similar Homes | In Balance |
| Neighborhood Values High | 415,000 | Typical Marketing Time | 90-120 Days |
| Predominant Value | 350,000 | Vandalism Present in Area | No |
| Number of Homes in Direct Competition | 0 | Average DOM Active Comps | 58 |
| Number of Similar Homes Sold in Last 6 Months | 47 | Average DOM Sold Comps | 61 |
| Neighborhood Comments | Comps selected for this report are all settled properties within the subjects market considered to be the best available at the time of the inspection and good indicators of market value. Note that overall market Condition has been taken into account in arriving at final opinion of value. Current recent sales, under contract sales and active listings have been considered. | | |





| price | 151 | 169 | 189 | 217 | 261 | 430 | 533 | 497 | 322 | 235 | 273 | 225 | 261 | 339 | 307 | 363 | 362 | 376 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| volume | 42 | 57 | 97 | 52 | 158 | 147 | 164 | 45 | 23 | 36 | 35 | 48 | 43 | 63 | 45 | 55 | 62 | 51 |

## Area Sales Data

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | % Change | Overall Trend |
|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 95 | 47 | 46 | -30 % | Decreasing |
| Absorption Rate (Total Sales/Months) | 16 | 16 | 15 | -30 % | Decreasing |
| Total # of Comparable Active Listings | 83 | 79 | 71 | -26 % | Decreasing |
| Months of Housing Supply (Total Listings/Absorption Rate) | 5 | 5 | 5 | 2 % | Stable |

| Median Sale & List Price, DOM, List to Sales Ratio | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | % Change | Overall Trend |
|---|---|---|---|---|---|
| Median Comparable Sale Price | 309,900 | 330,000 | 326,000 | 7 % | Increasing |
| Median Comparable Sales DOM | 88 | 58 | 82 | -4 % | Stable |
| Median Comparable List Price | 349,000 | 339,900 | 365,000 | 12 % | Increasing |
| Median Comparable Listings DOM | 64 | 61 | 74 | -3 % | Stable |
| Median Sale Price as % of List Price | 97 % | 98 % | 99 % | 1 % | Stable |



**Subject Property**
12715 SW 84th St
Cutler Bay, FL 33189

**BPO** BROKER PRICE OPINION

Inspection Date: 08/20/2018    (Exterior Form)

## Deferred Maintenance

**Deferred Maintenance Present or Repairs Needed?**  No

| # | Description | Cost | Comments |
|---|---|---|---|
| 1 | | $ | |
| 2 | | $ | |
| 3 | | $ | |
| 4 | | $ | |
| 5 | | $ | |
| 6 | | $ | |
| 7 | | $ | |
| 8 | | $ | |
| 9 | | $ | |
| 10 | | $ | |
| | Total Repair Costs | $ 0 | |

## Comparable Sales

| Comparable Sales | Subject | Sale 1 | Sale 2 | Sale 3 |
|---|---|---|---|---|
| Street Address | 19771 SW 84th Ave | 8230 204th St | 20411 84th Ave | 8240 185th St |
| City, State Zip | Cutler Bay, FL 33189 | Cutler Bay FL 33189 | Cutler Bay FL 33189 | Cutler Bay FL 33157 |
| Sale Date | | 05/07/2018 | 05/07/2018 | 02/23/2018 |
| Sale Price | | 370,000 | 362,900 | 358,000 |
| Proximity To Subject (Miles) | | 0.39 mi S | 0.42 mi S | 0.92 mi N |
| Condition | Average | Average | Average | Average |
| Data Source | Tax Records | Tax Records | MLS | MLS |
| Property Type | Single Family | Single Family | Single Family | Single Family |
| Property Style | Ranch / 1 Story | Ranch / 1 Story | Ranch / 1 Story | Ranch / 1 Story |
| Above Grade Sq Ft | 1,887 | 1,825 | 1,865 | 2,314 |
| # of Units | 1 | 1 | 1 | 1 |
| Lot Size | 8925 Sq Ft | 8276 Sq Ft | 9147 Sq Ft | 15681 Sq Ft |
| Year Built | 1973 | 1974 | 1973 | 1977 |
| Age | 45 | 44 | 45 | 41 |
| Total # Rooms | 8 | 6 | 6 | 7 |
| Bed / Full Ba. / Half Ba. | 4 / 3 / 0 | 3 / 2 / 0 | 3 / 2 / 0 | 4 / 2 / 0 |
| Financing Method | Conventional | Conventional | Conventional | Conventional |
| Transaction Type | Traditional Resale | Traditional Resale | Traditional Resale | Traditional Resale |
| Owner | Owner Occ | Owner Occ | Owner Occ | Owner Occ |
| Seller Concessions | 0 | 0 | 0 | 0 |
| Price Per Sq Ft | | $202.74 | $194.58 | $154.71 |
| DOM | | 56 | 124 | 46 |
| List Price At Sale | | 385,000 | 362,900 | 415,000 |
| Original List Price | 459,000 | 385,000 | 362,900 | 415,000 |
| Original List Date | 12/21/2005 | 03/12/2018 | 01/03/2018 | 01/08/2018 |
| Basement | No | No | No | No |
| Basement Type | | | | |
| Basement Total Sq Ft | | | | |
| Basement Finished Sq Ft | 0 | | | |
| Garage Type | Attached | Attached | Attached | Attached |
| Number of spaces | 1 | 2 | 1 | 2 |
| Pool / Spa | Pool and Spa | Pool and Spa | Pool and Spa | Pool and Spa |
| View | Residential | Residential | Residential | Residential |
| Adjustment | | 4,358 | 3,172 | -25,765 |
| Adjusted Price | | 374,358 | 366,072 | 332,235 |

Computershare

**Subject Property**
19771 SW 84th Ave
Cutler Bay, FL 33189

**BPO** BROKER PRICE OPINION
Inspection Date:08/20/2018    (Exterior Form)

## Comparable Comments and Adjustment Justification

**Comparable Sale 1**
Similar in Lot Size, Year, Full Bath, Sqft.  Superior in Garage.  Inferior in Bed Room.
Sale 1: Lot Size: $36; Year: -$100; Bed Room: $2,000; Sqft: $3,423; Garage: -$1,000; Total: $4,358

**Comparable Sale 2**
Similar in Lot Size, Year, Full Bath, Sqft, Garage.  Inferior in Bed Room.
Sale 2: Lot Size: -$42; Bed Room: $2,000; Sqft: $1,214; Total: $3,172

**Comparable Sale 3**
Similar in Year, Bed Room, Full Bath.  Superior in Lot Size, Sqft, Garage.
Sale 3: Lot Size: -$794; Year: -$400; Sqft: -$23,572; Garage: -$1,000; Total: -$25,765

| Comparable Listings | Subject | List 1 | List 2 | List 3 |
|---|---|---|---|---|
| Street Address | 19771 SW 84th Ave | 8751 200th Ter | 7960 197th Ter | 8315 206th Ter |
| City, State Zip | Cutler Bay, FL 33189 | Cutler Bay FL 33189 | Cutler Bay FL 33189 | Cutler Bay FL 33189 |
| List Date | | 02/26/2018 | 07/05/2018 | 05/23/2018 |
| Current List Price | | 365,000 | 375,000 | 384,900 |
| Proximity To Subject (Miles) | | 0.51 mi W | 0.25 mi E | 0.51 mi S |
| Condition | Average | Average | Average | Average |
| Data Source | Tax Records | MLS | MLS | MLS |
| Property Type | Single Family | Single Family | Single Family | Single Family |
| Property Style | Ranch / 1 Story | Ranch / 1 Story | Ranch / 1 Story | Ranch / 1 Story |
| Above Grade Sq Ft | 1,887 | 1,670 | 1,660 | 1,997 |
| # of Units | 1 | 1 | 1 | 1 |
| Lot Size | 8925 Sq Ft | 8276 Sq Ft | 7840 Sq Ft | 9583 Sq Ft |
| Year Built | 1973 | 1971 | 1974 | 1973 |
| Age | 45 | 47 | 44 | 45 |
| Total # Rooms | 8 | 6 | 7 | 7 |
| Bed / Full Ba. / Half Ba. | 4 / 3 / 0 | 3 / 2 / 0 | 4 / 2 / 0 | 4 / 2 / 0 |
| Transaction Type | Traditional Resale | Traditional Resale | Traditional Resale | Traditional Resale |
| Owner | Owner Occ | Owner Occ | Owner Occ | Owner Occ |
| Price Per Sq Ft | | $218.56 | $225.90 | $192.74 |
| DOM | 0 | 175 | 46 | 89 |
| MLS Status | | Active | Active | Active |
| Original List Price | 459,000 | 350,000 | 375,000 | 390,000 |
| Original List Date | 12/21/2005 | 02/26/2018 | 07/05/2018 | 05/23/2018 |
| Basement | No | No | No | No |
| Basement Type | | | | |
| Basement Total Sq Ft | 0 | | | |
| Basement Finished Sq Ft | 0 | | | |
| Garage Type | Attached | Attached | Attached | Attached |
| Number of spaces | 1 | 1 | 2 | 2 |
| Pool / Spa | Pool and Spa | None | Pool and Spa | Pool and Spa |
| View | Residential | Residential | Residential | Residential |
| Adjustment | | 19,232 | 11,531 | -7,157 |
| Adjusted Price | | 384,232 | 386,531 | 377,743 |

**Subject Property**
13771 SW 84 Ter
Cutler Bay, FL 33189

**BPO** BROKER PRICE OPINION

Inspection Date: 08/20/2018   (Exterior Form)

## Comparable Comments and Adjustment Justification

**Comparable List 1**
Similar in Lot Size, Year, Full Bath, Garage.  Inferior in Bed Room, Sqft.
List 1: Lot Size: $53; Year: $200; Bed Room: $2,000; Sqft: $11,979; Pool: $5,000; Total: $19,232

**Comparable List 2**
Similar in Lot Size, Year, Bed Room, Full Bath.  Superior in Garage.  Inferior in Sqft.
List 2: Lot Size: $100; Year: -$100; Sqft: $12,531; Garage: -$1,000; Total: $11,531

**Comparable List 3**
Similar in Lot Size, Year, Bed Room, Full Bath.  Superior in Sqft, Garage.
List 3: Lot Size: -$85; Sqft: -$6,072; Garage: -$1,000; Total: -$7,157

## Value Conclusion

| | | | |
|---|---|---|---|
| **As-Is (60-90 Days)** | $ 358,000 | **Repaired (60-90 Days)** | $ 358,000 |
| **As-Is (Quick Sale)** | $ 340,000 | **Repaired (Quick Sale)** | $ 340,000 |
| | **Estimated Land Value** | $ 86,100 | |

## Broker Addendum & Subject Comments

Search for comps was done using a 1 mile radius around the subject, 30% difference in gla, 20 years difference in age and a 180 day close date.The subject property is bracketed well by these comparables. The value of the subject is in line with the current market trends. The comps used in this report support the subject value. The value is well bracketed by the Sold comps to arrive at a value that the subject can successfully be sold for.

## Quality Control Reviewer Comments

None

Subject data matches tax record and AVM data. Garage type is nowhere available to validate. Correct photos are confirmed by prior BPO order.

![Computershare] **BPO** BROKER PRICE OPINION

Subject Property
19771 SW 84th Ave
Cutler Bay, FL 33189

Inspection Date: 08/20/2018    (Exterior Form)

## General Addendum

This document is not an appraisal as defined by USPAP (Uniform Standards of Professional Appraisal Practice). It is not to be construed as an appraisal and may not be used as such for any purpose. The intended user of this report is the Client(s) named above and is to be used at the Client's sole discretion. This report is not intended as any guarntee of value and/or condition of the subject property and should not be relied on as such. Any opinion rendered in this report is that of the report preparer and does not necessarily reflect the views and opinions of Computershare LLC or its owners, affiliates and or assigns. All data contained herein is deemed accurate and reliable but not guaranteed.

Copyright (C) Computershare LLC

## Proximity Map



| | Subject | | Proximity |
|---|---|---|---|
| Subject | 19771 SW 84th Ave | Cutler Bay, FL 33189 | |
| Sold Comp 1 | 8230 204th St | Cutler Bay FL 33189 | 0.39 mi S |
| Sold Comp 2 | 20411 84th Ave | Cutler Bay FL 33189 | 0.42 mi S |
| Sold Comp 3 | 8240 185th St | Cutler Bay FL 33157 | 0.92 mi N |
| List Comp 1 | 8751 200th Ter | Cutler Bay FL 33189 | 0.51 mi W |
| List Comp 2 | 7960 197th Ter | Cutler Bay FL 33189 | 0.25 mi E |
| List Comp 3 | 8315 206th Ter | Cutler Bay FL 33189 | 0.51 mi S |

## Subject Aerial View



**Subject Property**
19771 SW 84th Ct.
Cutler Bay, FL 33189

Inspection Date: 08/20/2018    (Exterior Form)

**BPO** BROKER PRICE OPINION

**Subject Property Photos** | **Front View**



**Left Side**



**Right Side**



**Street View**



**Address Verification**



**Computershare**

Subject Property
12-1 W 84 Terrace
Cutler Bay, FL 33189

**BPO** BROKER PRICE OPINION
Inspection Date: 08/20/2018    (Exterior Form)

## Comparable Property Photos

**Sale 1**



8230 204th St
Cutler Bay FL 33189
Sold for $370,000 on 05/07/2018

**List 1**



8751 200th Ter
Cutler Bay FL 33189
Listed for $365,000 on 02/26/2018

**Sale 2**



20411 84th Ave
Cutler Bay FL 33189
Sold for $362,900 on 05/07/2018

**List 2**



7960 197th Ter
Cutler Bay FL 33189
Listed for $375,000 on 07/05/2018

**Sale 3**



8240 185th St
Cutler Bay FL 33157
Sold for $358,000 on 02/23/2018

**List 3**



8315 206th Ter
Cutler Bay FL 33189
Listed for $384,900 on 05/23/2018

**Additional Photos**



Street sign